USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9/29/06

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - x
                           :

JAY MITCHELL BAUMAN, M.D., P.C.,
and JAY MITCHELL BAUMAN, individually,  :

              Plaintiffs,       :    **OPINION**

      -against-          :    05 Civ. 7126 (DC)

MOUNT SINAI HOSPITAL, MICHAEL L.     :
BRODMAN, M.D., BURTON DRAYER, M.D.,
PETER RUBIN, M.D., BARRY BROWN, M.D., :
FRANK CALAPARI, M.D., ANNA BARBIERI,
M.D., REBECCA AMARU, M.D., CYNTHIA R. :
ALLEN, C.P.C.S., and JOHN and/or JANE
DOE 1-10,                    :

              Defendants.     :

- - - - - - - - - - - - - - - - - - - - x

**APPEARANCES:**    LIFSHUTZ & LIFSHUTZ, P.C.
                Attorneys for Plaintiffs
                    By:  Marvin L. Lifshutz, Esq.
                674 Third Avenue
                New York, NY  10118

                EDWARDS ANGELL PALMER & DODGE LLP
                Attorneys for Defendants Mount Sinai Hospital,
                  Brodman, Drayer, and Brown
                    By:  David R. Marshall, Esq.
                 750 Lexington Avenue
                New York, NY  10022

**CHIN, D.J.**

          Plaintiff Jay Mitchell Bauman, M.D., individually and
on behalf of the professional corporation of which he is the sole
member, asserts claims against defendant Mount Sinai Hospital
(the "Hospital"), members of its staff, and affiliated physicians
for violations of the Health Care Quality Improvement Act of 1986
("HCQIA"), the Racketeer Influenced and Corrupt Organizations Act
("RICO"), and state law.  Plaintiffs' claims relate to the

suspension and eventual termination of Dr. Bauman's Hospital privileges for his allegedly improper use of labor-inducing medication.  Before the Court is a motion to dismiss filed by certain defendants pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6).  Because I conclude that plaintiffs should have raised their claims in the first instance before the New York State Public Health Council, and that, in any event, their claims are without merit, the motion is granted.

## BACKGROUND

### A.   The Facts

The facts below are drawn from the Amended Complaint and attached exhibits.[1]  The Amended Complaint is not a typical pleading.  Rather than setting forth a short and plain statement as required by Federal Rule of Civil Procedure 8(a), the Amended Complaint is 150 paragraphs and comes with twenty-three exhibits -- including a 244-page transcript of Dr. Bauman's appeal hearing.  These materials are deemed part of the Amended Complaint and are considered on this motion.  While the facts set forth in the Amended Complaint and attached materials are construed in the light most favorable to plaintiffs, I need not accept plaintiffs' conclusory allegations as true where they are plainly contradicted by plaintiffs' own exhibits.

---

[1]     After defendants moved to dismiss the original complaint, plaintiffs filed the Amended Complaint the same day they filed their opposition to defendants' motion.  As defendants addressed the Amended Complaint in their reply papers, their motion is deemed addressed to the sufficiency of the Amended Complaint.

1.   **The Parties**

Dr. Bauman is a solo practitioner, board certified in Obstetrics and Gynecology.  (AC ¶¶ 3, 14).[2]  He has spent his entire professional career affiliated with the Hospital, the only hospital with which he has ever had privileges.  (AC ¶¶ 5, 9-10, 17).  He chose to seek privileges there as a practitioner of Orthodox Judaism, and his patients largely hail from the New York Orthodox Jewish community.  (AC ¶¶ 9, 11).  Over the years, his practice has grown to include more than 200 pregnant patients each year.  (AC ¶¶ 15, 40).

Defendants fall into four categories:

(1) The Hospital is a healthcare facility and training center for medical staff, located in Manhattan, New York.  (AC ¶¶ 17, 30).  It maintains a busy labor and delivery floor that operates at full capacity during the work week and services some 5,200 patients yearly.  (AC ¶¶ 35-36, 38).

(2) Defendants Michael L. Brodman, Burton Drayer, Peter Rubin, Barry Brown, and Cynthia R. Allen are Hospital administrators involved in the implementation of Dr. Bauman's suspension.  (AC ¶ 30).

(3) Defendants Frank Calapari, Anna Barbieri, and Rebecca Amaru are physicians affiliated with the Hospital, who

---

[2]   Citations are as follows: "AC" is to the Amended Complaint, "PX" is to plaintiffs' exhibits attached to the Amended Complaint, and "Tr." is to the transcript of the March 1, 2005 appeal hearing, attached to the Amended Complaint as Exhibit 14.

have taken over care for Dr. Bauman's patients since his suspension.  (AC ¶¶ 24-26, 30).

(4) Defendants John and/or Jane Doe 1-10 are physicians or medical professional corporations from outside the Hospital who received privileges after Dr. Bauman's privileges were suspended.  (AC ¶¶ 27, 30).

The motions to dismiss have been filed only on behalf of the Hospital and Administrators Brodman, Drayer, and Brown.

### 2.   Use of Misoprostol at the Hospital

Misoprostol (or Cytotec) is approved by the Federal Drug Administration (the "FDA") for treatment of gastrointestinal ailments, but may also be used "off-label" to induce labor.  (AC ¶¶ 47-48).  The FDA, however, has explicitly warned against such off-label use due to serious health risks, including uterine rupture and birth defects.  (AC ¶¶ 49, 53; PX 2, 5).  Despite these health risks, the Hospital nonetheless maintains a written protocol, issued in February 2000, for monitoring a patient induced with Misoprostol.  (AC ¶ 60; PX 9; Tr. 28-32).  Plaintiffs contend, upon information and belief, that the Hospital, with approval of administrators named as defendants in this suit, has billed Medicaid for services in connection with births induced by off-label use of Misoprostol (AC ¶¶ 61-63), against Medicaid's explicit policy against paying for services that are "experimental in nature" (AC ¶¶ 59, 63; PX 8).

### 3.   <u>Summary Suspension of Dr. Bauman</u>

### a.   <u>The Suspension</u>

By letter dated February 22, 2005, Dr. Brodman --
Chairman of the Hospital's Department of Obstetrics, Gynecology,
and Reproductive Services -- informed Dr. Bauman that his
privileges at the Hospital were summarily suspended pending an
investigation of charges that he had used Misoprostol to induce
labor in violation of Hospital protocol.  (AC ¶¶ 20, 65-66; PX
10).  In the letter, Dr. Brodman referred to two incidents -- on
January 10, 2005, and February 3, 2005 -- where "what appeared to
be a portion of a misoprostol pill" was found in Dr. Bauman's
patients.  (AC ¶¶ 70-71; PX 10).  The letter explained this
practice "demonstrates unacceptable clinical judgment and . . . a
breach of professional ethics."  (PX 10).  Dr. Bauman responded
by denying the charges and acknowledging that unauthorized use of
Misoprostol was against Hospital protocol.  (AC ¶¶ 72-73; PX 11,
12).

Dr. Brodman's February 22 letter did not identify the
patients involved, the names of any witnesses to the incidents,
or the existence of physical evidence to substantiate the claims,
but Dr. Brodman did inform Dr. Bauman of his right to appeal the
suspension.  (AC ¶¶ 68, 71; PX 10).  The summary suspension was
confirmed by the Hospital President, Dr. Drayer, in a letter on
February 25, 2005.  (AC ¶ 80; PX 13).

b.   **The Appeal and Hearing**

Dr. Bauman immediately appealed his suspension pursuant to the internal physician peer review procedures in the By-laws of the Hospital's Medical Staff (the "By-Laws").  He asked the Medical Board President, Dr. Rubin, by letter dated February 22, 2005, for "a meeting . . . to promp[t]ly end this matter by removing any doubts regarding my conduct and medical practice." (AC ¶ 73; PX 12, 20).

The hearing commenced, approximately one week later, on March 1, 2005.  The purpose was to determine whether sufficient evidence existed to find that the suspension was "not arbitrary and capricious."  (Tr. 10-11).  The President may only summarily suspend someone if "[f]ailure to do so may result in an imminent danger to the health of any individual."  (Tr. 11; PX 12 art. IX § 2A).  Dr. Bauman and the Hospital, represented by Dr. Brodman, were permitted to call and cross-examine witnesses, introduce evidence, and have counsel present to advise them.  (AC ¶¶ 86-91; Tr. 10, 15).  While counsel for both sides were present, their roles were limited, and the Federal Rules of Evidence did not apply.  (Tr. 10).

Dr. Bauman's counsel had been informed, by letter dated February 28, 2005, of the Hospital's intent to call three witnesses: Dr. Brodman, Dr. Drayer, and Dr. Arthur Figur, Medical Director of the Hospital.  (AC ¶ 87; PX 15).  Those three witnesses testified under oath for the Hospital.  Dr. Bauman called seven witnesses to attest to his character and competence

and also testified on his own behalf.  Set forth below is a summary of their testimony.

### i)   **The Two Misoprostol Incidents**

Dr. Brodman testified about the details behind the two Misoprostol incidents on January 10, 2005, and February 3, 2005. He admitted that the Hospital "often" engaged in the off-label use of Misoprostol to induce labor, but that Dr. Bauman's alleged use flouted Hospital protocol.  (Tr. 28-32; PX 9).  He was informed about the January 10, 2005 incident by a managing nurse who heard the story from the physician's assistant, Stacy Gonzalez, who attended to Dr. Bauman's patient.  The patient arrived from Dr. Bauman's office to undergo a test for fetal well-being.  The test results were normal, but then the patient began forceful contractions.  Gonzalez conducted a pelvic exam and reported removing a Misoprostol tablet from the patient. (Tr. 33-34).  Dr. Brodman investigated the incident after consulting with Dr. Figur, who also spoke with the patient to confirm that she had been examined by Dr. Bauman that day.  (Tr. 64-65).  In addition, Gonzalez told Dr. Figur that she recognized the Misoprostol tablet because she administers the insertion of such tablets for induction.  (Tr. 65).

Dr. Brodman learned the details of the February 3, 2005 incident from a third-year resident who examined Dr. Bauman's patient that evening and removed what she believed was a Misoprostol tablet.  (Tr. 36-37, 40-41, 47).  The patient

reported to the resident that she had been examined by Dr. Bauman earlier that day, but was not aware of being induced.  (Tr. 37).

### ii)  Dr. Bauman's Disciplinary History

Dr. Figur testified as well about Dr. Bauman's disciplinary history stemming from incidents related to his high patient load.  (Tr. 55).  He described three separate incidents -- in 1994, 2001, and 2003 -- when Dr. Bauman was disciplined by the Hospital.  (Tr. 50-54, 57-58, 61-63).  These included leaving one patient on the operating table, while he delivered another patient (Tr. 52-53), failing to perform all deliveries he had agreed to perform under a union contract (Tr. 50-52), and the apparent clustering of his patients for induction on the labor floor (Tr. 53-54).  All three incidents resulted in additional monitoring of his care and other corrective actions.  (Tr. 52-53, 61-62).  Dr. Bauman largely complied with the corrective actions for each of these disciplinary incidents and was removed from probation in December 2004.  (Tr. 61-62, 68-70).

### iii)  The Suspension Decision

Dr. Brodman also testified that on February 23, 2005, he presented the two Misoprostol incidents to the Hospital's Quality Control Committee (the "QCC"), which decided the situation warranted summary suspension.  (Tr. 41).  Dr. Brodman explained that he pursued the suspension because there were two separate incidents where Misoprostol was allegedly found and he discovered "no reason why" either the physician's assistant or the third-year resident would lie to him.  (Tr. 239).  Dr.

Drayer, the Hospital President, testified that the QCC's decision
to suspend Dr. Bauman's privileges and his letter on February 25,
2005 conveying that decision to Dr. Bauman were based upon the
information presented to the QCC.  (Tr. 74, 75, 77).  He
explained that decisions to suspend privileges are difficult and
uncommon in his experience.  (Tr. 79).

### iv)  Dr. Bauman's Case

On his own behalf, Dr. Bauman testified that he would
have had no reason to engage in an unauthorized and unethical
induction of a patient -- especially when he could easily perform
a proper induction in the Hospital and did not even have access
to Misoprostol in his office.  (Tr. 89-93, 233-34).  He contended
that the individuals who purportedly found the Misoprostol were
either mistaken or else may have had reasons for fabricating the
charges.  (Tr. 99-101).  He believed that there had been
"grumblings" about his patient load on the labor floor for a year
that might have contributed to the charges.  (Tr. 220-21).  The
patient he saw on January 10 had terminated a pregnancy, and the
remains may have been what Gonzalez mistook for Misoprostol.
(Tr. 99-101).  Moreover, he argued that it was unlikely that a
Misoprostol tablet would remain undissolved for the length of
time necessary for the resident to find it during the February 3
incident.  (Tr. 103, 235).

Dr. Bauman then called a series of character witnesses
-- seven in all -- to testify on his behalf.  Most were
physicians, two were nurses, and one was his nurse practitioner

student; all had worked with Dr. Bauman.  They testified across the board to Dr. Bauman's hard work ethic and "outstanding" care for his patients.  A number of them had referred patients -- including their own children -- to Dr. Bauman.  (Tr. 110-11, 121, 130-31, 141, 172-74, 182-83).  Dr. Mark D. Horowitz, who shared an office with Dr. Bauman, said that he had never seen Misoprostol in their office.  (Tr. 124-25).  Dr. Bauman's nurse practitioner student testified that she had never seen him conduct pelvic examinations by inserting anything other than a gloved hand with jelly into his patients.  (Tr. 151, 160, 169).  Dr. Bauman also introduced a letter from the February 3, 2005 patient's husband, stating that a woman was in the room during the examination, to support the inference that the nurse practitioner student was present at the particular examination in question.  (Tr. 164-65, 68).

An obstetrician/gynecologist on the Hospital staff testified about problems on the labor floor among the staff and that she would "be careful about . . . what you take as fact from any resident" because they often do inaccurate exams.  (Tr. 136-37, 138, 139-40).  Finally, she testified that in her experience it is possible for a "piece of mummified fetus" to look to the untrained eye like a Misoprostol tablet.  (Tr. 142-43).  Two nurses from the labor floor testified that in their experience a Misoprostol tablet would dissolve in about three hours -- a shorter length of time than had passed between the patient's visit to Dr. Bauman's office and the alleged discovery of

Misoprostol on February 3, 2005.  (Tr. 184, 193).  Moreover, one nurse testified that a patient would not be walking about in the first hour after insertion of the pill, or the medication would not stay in place, and that vaginal secretions would make it difficult to find an undissolved tablet, unless someone already knew it was present.  (Tr. 196, 198-200).  The nurses also stated their belief that some hospital staff, including the physician's assistant involved, might provide misinformation based on hard feelings against Dr. Bauman, or for race or religious reasons.  (Tr. 187-89, 200).

### v. **The Hearing Committee's Decision**

With Dr. Bauman's consent, the Committee deliberated that same evening, immediately after the close of the hearing.  The hearing had lasted some four hours long, and eleven witnesses (including Dr. Bauman) testified.  The Committee issued an oral decision that night unanimously upholding Dr. Bauman's suspension.  (Tr. 241, 242-43).  The decision was confirmed in a written opinion issued on March 21, 2005.  (PX 17).

The Committee reiterated that its task was "not to make findings as to whether [Dr. Bauman] engaged in [the alleged] conduct, but to determine whether the Chair was arbitrary and capricious in light of the[] two reported incidents in summarily suspending [his] privileges pending a more complete investigation."  (PX 17 at 2).  Given that Dr. Brodman consulted with Dr. Drayer and Dr. Figur, brought the issue before the QCC, and personally spoke with the individuals who recovered the

alleged tablets, and Dr. Bauman had been counseled twice before for incidents connected to the large volume of his practice, the Committee found that this evidence could not be outweighed by the numerous witnesses Dr. Bauman presented as to his character and competence.  (AC ¶ 99; PX 17 at 2-3).  The Committee also noted that Dr. Bauman had admitted at the hearing that, given the allegations of Misoprostol use presented to Dr. Brodman, he "would have done the same thing . . . to protect the patients." (PX 17 at 3; Tr. 210).  The Committee concluded "that further investigation of the two incidents in question [was] warranted" and should "proceed as expeditiously as possible."  (PX 17 at 3).

Dr. Bauman appealed the decision through counsel to the Hospital's Board of Trustees on March 24, 2005.  (AC ¶ 101; PX 18, 12 art. X, § 4).

### 4.   The Reinstatement Agreement

In the meantime, on March 11, 2005, the Hospital offered to reinstate Dr. Bauman's privileges on a provisional basis in exchange for his consent to certain restrictions on his practice.  (AC ¶ 94; PX 16).  The terms of his reinstatement were embodied in a written agreement (the "Agreement") signed by Dr. Brodman and Dr. Drayer.  (PX 16).  The Agreement specifically provided that the "summary suspension pending investigation [would] be conditionally lifted subject to" various restrictions in the Agreement and "the final outcome of the investigation." (PX 16 ¶ 1).  Dr. Bauman's privileges were to be restored on a limited basis subject to his "undergoing a toxicology screen" and

submitting to "random toxicology screens."  (PX 16 ¶ 2).  Dr. Bauman was to also undergo several psychiatric evaluations at his own cost for review by Hospital administrators and other Hospital representatives.  (PX 16 ¶ 3).  Dr. Bauman had to agree to a restriction on his hours of practice, including going off duty every other night, arranging for coverage on his nights off, and providing a monthly schedule of that coverage.  His patients on the labor and delivery floors would have to "undergo a vaginal examination; fetal heart monitoring . . . ; and an interview to collect data regarding last office visit and examination, reason for admission, and pertinent information."  (PX 16 ¶ 6).  He would have to advise his patients of these arrangements, and regularly report to Dr. Brodman on the volume and timing of his admissions and deliveries.  (PX 16 ¶ 4(d)).

Moreover, Dr. Bauman agreed "not to retaliate . . . against any individual who was a witness . . . associated with the events" leading to his summary suspension and to release the Hospital and its staff with respect to any action taken in connection with the suspension, including waiving his appeal to the Board of Trustees, unless the investigation concluded with his termination.  (PX 16 ¶¶ 7, 11).  The Hospital reserved the right to take any further appropriate action based on information from the investigation.  These restrictions were to "continue indefinitely."  (PX 16 ¶ 12).  Dr. Bauman signed the Agreement nearly one month later, on April 8, 2005, and immediately resumed admitting patients at the Hospital.  (AC ¶ 102).

### 5.    __The National Practitioner Data Bank Report__

On April 19, 2005, the Hospital's Director of Medical
Staff Services, Cynthia Allen, submitted a report to the National
Practitioner Data Bank (the "Data Bank") in compliance with the
HCQIA, 42 U.S.C. § 11101, <u>et seq.</u>, and implementing regulations,
45 C.F.R. §§ 60.4, 60.9, which mandate that a hospital must
report any adverse actions affecting a physician's clinical
privileges for more than thirty days.  42 U.S.C. §§ 11133-34; 45
C.F.R. §§ 60.9(a) and 9(b).  The two-page document (the "Report")
provides Dr. Bauman's identifying information and then describes
-- in brief phrases -- the adverse action taken against Dr.
Bauman: "Hospital privileges summarily suspended due to concerns
relating to patient care" and "Summary suspension pending full
investigation of patient care concerns."  (AC ¶ 104; PX 21).  As
a result of the Report and its effect on his reputation, Dr.
Bauman alleges that he "effectively lost his practice," and Dr.
Brodman and others affiliated with the Hospital have benefitted
from that loss by taking over his practice.  (AC ¶¶ 105-06).

### 6.    __The Investigation and Dr. Bauman's Termination__

In keeping with the Agreement and ongoing
investigation, Dr. Bauman submitted to medical examinations to
prove his competence and fitness.  He traveled to Massachusetts
to be examined by doctors designated by defendants.  (AC ¶¶ 107-
09).  He also submitted a proposed coverage schedule for April 15
to May 31, 2005, as required by the Agreement's terms.  (PX 19).

On July 21, 2005, Dr. Brodman sent Dr. Bauman a letter
of termination from the Hospital's medical staff.  (AC ¶ 118; PX
23).  In the letter, Dr. Brodman wrote that the "Department
concluded its investigation of the misoprostol incidents and I
was about to recommend extension of the March 11 restrictions"
but then he "identified a number of troubling patterns in [Dr.
Bauman's] practice."  (PX 23).  He provided the following
examples: all of Dr. Bauman's patients were delivered during his
on-call hours; no apparent reduction in his patient load; a high
number of induced labors -- some of which were unsupported by
objective clinical findings and one incident where four patients
were induced in a single day; failure to refer patients to the
designated covering physician; and failure to go off call every
other night in violation of the Agreement.  (PX 23).

Dr. Brodman wrote: "Based on the information available
to me, including the psychiatric report obtained in connection
with the . . . investigation and the outcome of that
investigation, I have concluded that your termination from the
medical staff is warranted."  (PX 23).  He then provided the
following reasons: "(i) your pattern of practice is unacceptable;
(ii) your actions violate both the letter and spirit of the
[Agreement]; (iii) you have violated the Hospital's requirement
that you cooperate;" and "(iv) your refusal to meet with your
Chair about Departmental and patient care matters is
insubordinate and unacceptable."  (PX 23).  Dr. Bauman was
notified of his right to appeal the termination to the Board of

- 15 -

Trustees pursuant to Article X of the By-Laws.  Instead of filing an appeal, however, Dr. Bauman chose to pursue his remedies in state and federal court.

**B.    Procedural History**

**1.    Article 78 Proceeding**

One week prior to his termination, on July 14, 2005, Dr. Bauman brought a petition in New York State Supreme Court under Article 78 of the Civil Practice Law and Rules seeking preliminary and permanent injunctive relief restoring his full privileges at the Hospital.  (AC ¶¶ 114-17; PX 22).  On July 29, 2005, the preliminary injunction was denied on the grounds that Dr. Bauman's failure to exhaust his administrative remedies precluded him from showing that his petition for injunctive relief was likely to succeed.  The Hospital moved to dismiss the petition, and the motion was granted on November 9, 2005, again due to Dr. Bauman's failure to exhaust his administrative remedies.  The court found "no evidence that the Hospital . . . failed to follow the disciplinary and suspension process" such that, as Dr. Bauman contended, pursuit of administrative remedies would have been futile.  Bauman v. Mt. Sinai Hosp., No. 109727/05, at 2 (Sup. Ct., N.Y. County, Nov. 9, 2005) (Beeler, J.).

**2.    The Current Action**

On August 11, 2005, Dr. Bauman filed the initial complaint in this action.  He then submitted the Amended

Complaint on January 5, 2006, asserting five claims.  The first seeks a declaratory judgment that the Report is void for inaccuracies in violation of the HCQIA and an injunction to remove the Report from the Data Bank.  The second and third are based on violations of RICO through repeated acts of mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, and violations of the federal health care statute, 18 U.S.C. § 1347, by allegedly distributing misinformation about plaintiff's competence and billing for services related to births induced by Misoprostol. The fourth is for common law fraud based on defendants' statements regarding the Agreement,[3] and the fifth is for common law defamation for filing a false report with the Data Bank. This motion followed.

## DISCUSSION

First, I consider defendants' assertion that the Amended Complaint should be dismissed because plaintiffs failed to first raise their claims before the New York State Public Health Council (the "PHC").  Under the doctrine of primary jurisdiction, I conclude that plaintiffs' claims should first be presented to the PHC.

Second, assuming the doctrine of primary jurisdiction is inapplicable, I consider plaintiffs' claims on the merits and conclude that they are without merit.

---

[3]     The initial complaint based the fraud claim on statements contained in the Report, while the Amended Complaint based plaintiffs' fraud claim on statements made to Dr. Bauman about the Agreement.

**A.**    **Primary Jurisdiction**

   **1.**    **Applicable Law**

          The doctrine of primary jurisdiction "comes into play

whenever enforcement of [a] claim requires the resolution of

issues, which, under a regulatory scheme, have been placed within

the special competence of an administrative body."  Johnson v.

Nyack Hosp., 964 F.2d 116, 122 (2d Cir. 1992) (quoting United

States v. W. Pac. R.R. Co., 352 U.S. 59, 64 (1956)).  Primary

jurisdiction is a discretionary doctrine that will be applied

only where it serves at least one of two purposes: "uniformity"

and "reliance on administrative expertise."  See Tassy v.

Brunswick Hosp. Ctr., Inc., 296 F.3d 65, 68 (2d Cir. 2002)

(citing W. Pac. R.R. Co., 352 U.S. at 64); see also Nyack, 964

F.2d at 122 (citing W. Pac. R.R. Co., 352 U.S. at 66) ("Primary

jurisdiction . . . recognizes that even though Congress has not

empowered an agency to pass on the legal issues presented by a

case . . . the agency's expertise may, nevertheless, prove

helpful . . . in resolving difficult factual issues.") (emphasis

in original).

          Under New York law, a hospital may curtail a

physician's privileges only for reasons related "to standards of

patient care, patient welfare, the objectives of the institution

or the character or competency of the [physician]."  N.Y. Pub.

Health Law § 2801-b(1).  A physician challenging the termination

of hospital privileges generally faces a two-step process.

Mahmud v. Bon Secours Charity Health Sys., 289 F. Supp. 2d 466,

472 (S.D.N.Y. 2003).  First, the physician must file a complaint
with the PHC and await review by that administrative body.  Id.
(citing N.Y. Pub. Health Law § 2801-b(2)).  Only then -- after
the PHC has had the opportunity to review the factual issues --
may the courts consider the claims, regardless of the outcome of
the PHC action.  Id.; see also Nyack, 964 F.2d at 122-23.  Thus,
a federal district court must refrain from hearing a damages
claim by a physician where the legitimacy of the termination of
the physician's privileges is dispositive, and the claim has not
first been filed before the PHC.  Nyack, 964 F.2d at 121; see
also Hamad v. Nassau County Med. Ctr., 191 F. Supp. 2d 286, 298
(E.D.N.Y. 2000) (reviewing constitutional claims where proper
termination of plaintiff's surgical privileges were not
dispositive of those claims).

        This filing "requirement is intended to take advantage
of the PHC's . . . peculiar expertise to assess whether a
hospital had a sound medical reason for terminating a physician's
privileges."  Mahmud, 289 F. Supp. 2d at 473 (quoting Nyack, 964
F.2d at 121).  It also applies to cases where the physician seeks
damages alone, rather than a reinstatement of privileges.  See
Nyack, 964 F.2d at 120 (damages for antitrust claims).

        The primary jurisdiction rule is subject to two narrow
exceptions.  Mahmud, 289 F. Supp. 2d at 473.  The first applies
when the physician alleges his or her privileges have been
terminated for reasons unrelated to medical care (e.g., sexual
harassment), and therefore do not invoke "the particular

- 19 -

expertise of the PHC."  Id. (quoting Tassy, 296 F.3d at 70-71).
The second applies when "(1) the plaintiff seeks damages, but not
reinstatement; and (2) the presence or absence of a proper
medical reason for terminating the plaintiff's privileges is not
dispositive of the plaintiff's claims."  Id. (emphasis in
original).  Thus, primary jurisdiction may warrant dismissal of
certain claims in a complaint while allowing other claims that
fall under these exceptions to survive.  See, e.g., id. at 475-76
(dismissing, inter alia, antitrust claims for failure to file
first with PHC but reviewing merits of slander claim that did not
require PHC's "specialized knowledge").

   2.   **Application**

        Although plaintiffs do not directly challenge the
termination of Dr. Bauman's Hospital privileges, the claims
necessarily implicate the propriety of the Hospital's actions,
including the decision to summarily suspend him.  These issues
are raised by all of plaintiffs' claims, for even the RICO and
defamation claims are based on the alleged illegitimacy of the
suspension and investigation.  Plaintiffs contest, apparently,
whether summary suspension pending an investigation was
warranted, whether a "full investigation" was properly conducted,
and whether the investigation related to "patient care."  An
inquiry into all of these issues would undoubtedly require a
consideration of information obtained during the investigation,
review of patient charts, and evaluation of other medical data

that the PHC would be more adept at reviewing in the first instance.  See Tassy, 296 F.3d at 70.

Furthermore, neither of the two exceptions to the doctrine applies here.  The first exception does not apply because the "particular expertise of the PHC" would be useful to determine, for example, whether a thorough medical investigation was undertaken and whether the investigation truly related to patient care concerns.  See id. (declining to apply primary jurisdiction where basis of termination of privileges was sexual harassment).  The second exception is also inapplicable.  While it is true that Dr. Bauman seeks damages and not reinstatement, the "presence or absence of a proper medical reason for terminating the plaintiff's privileges" is dispositive of his claims.  Mahmud, 289 F. Supp. 2d at 473 (emphasis added).

Because these are matters more appropriately considered by the PHC, I will invoke the doctrine of primary jurisdiction. Accordingly, the Amended Complaint is dismissed.

## B.  **The Merits**

Even assuming that the doctrine of primary jurisdiction does not apply, I would still grant defendants' motion, for plaintiffs' claims also fail on the merits.  Although these matters are more appropriately considered by the PHC, plaintiffs' claims are plainly frivolous.  The Amended Complaint is based on several untenable propositions: (1) Dr. Bauman's summary suspension, and the attendant precautions taken by the Hospital (e.g., limiting his privileges pursuant to the Agreement and

filing the Report with the Data Bank) were unwarranted; (2) a full investigation of genuine patient concerns was not conducted; and (3) Dr. Bauman was somehow defrauded.

Each of plaintiffs' causes of action relies on at least one of these contentions. Plaintiffs' first and fifth causes of action, for a declaratory judgment and for defamation, both rest upon the claim that the Report describing Dr. Bauman's summary suspension was somehow false. Plaintiffs contest the truth of the statement in the Report that Dr. Bauman was summarily suspended "pending full investigation of patient concerns." Plaintiffs' fourth cause of action for fraud is grounded on the allegation that the investigation of the charges against Dr. Bauman were "never continued nor concluded" -- and that defendants acted with "wanton dishonesty" to defraud plaintiffs into curtailing their practice by entering into the Agreement. The transmission through the mail of the allegedly false Report is also one act plaintiffs point to as a basis for the third and fourth causes of action, violations of RICO. The RICO claims are also based upon the premise that defendants' actions in implementing the suspension and restricting Dr. Bauman's privileges were unwarranted and motivated by a desire to take over Dr. Bauman's practice.

Because the underlying allegations at the heart of the Amended Complaint are entirely speculative and contradicted by plaintiffs' own exhibits, the Amended Complaint is dismissed on the merits as well.

### 1.    <u>Propriety of Summary Suspension</u>

Dr. Bauman suggests that the restrictions placed on his practice as a result of the suspension and as part of the Agreement to partially restore his privileges were motivated by a malicious intent to take over his practice.  Yet nothing in the record supports these conclusory allegations.  Based on the Amended Complaint and the exhibits attached thereto, one could only conclude that the Hospital, confronted with serious allegations about Dr. Bauman's conduct, had no choice but to take prompt action and investigate Dr. Bauman.

On January 10, 2005, a physician's assistant reported removing a Misoprostol pill from one of Dr. Bauman's patients. Both Dr. Brodman and Dr. Figur spoke with the physician's assistant.  The patient also confirmed with Dr. Figur that she had been examined by Dr. Bauman earlier that day.  On February 3, 2005, a third-year resident also reported removing a Misoprostol tablet from another one of Dr. Bauman's patients.  That patient had also been examined by Dr. Bauman prior to arriving at the Hospital.  Unmonitored use of Misoprostol to induce labor was clearly against Hospital protocol.  Dr. Brodman consulted with the QCC, and the QCC recommended summary suspension.  There had been three prior incidents in which Dr. Bauman's practices had been questioned and corrective action had been recommended.  Even assuming the witnesses to the latest incidents were mistaken or lying, it was certainly reasonable under all the circumstances for the Hospital to suspend Dr. Bauman in the face of such

allegations.  In fact, Dr. Bauman himself admitted at his appeal hearing that he would have taken the same precautions had he been in Dr. Brodman's shoes.

Because Dr. Bauman's summary suspension was reasonable, the letters sent to him by Dr. Brodman and Dr. Drayer implementing the summary suspension and describing the allegations of unauthorized Misoprostol use cannot form the basis of plaintiffs' fraud or RICO claims.  Similarly, the restrictions placed on his privileges as part of the Agreement and the Report to the Data Bank regarding that suspension were also reasonable, and do not provide a basis for plaintiffs' claims of fraud or defamation.  Indeed, Dr. Bauman agreed to the onerous restrictions, an acknowledgment that there might very well be some basis for the Hospital's concerns.

## 2.   Full Investigation of Patient Concerns

Dr. Bauman claims that no investigation of the Misoprostol charges against him was conducted or concluded, and that, if there was an investigation, it did not relate to genuine patient concerns.  Again, these allegations are simply contradicted by plaintiffs' own exhibits.  Just as the summary suspension was reasonable given the concerns about Dr. Bauman's alleged use of Misoprostol, the investigation was a continuation of defendants' review of Dr. Bauman's quality of patient care. Nothing in the record suggests that defendants were not acting in good faith to undertake a thorough investigation.  In fact, a

review of plaintiffs' exhibits shows the opposite conclusion is
the only reasonable conclusion.

The exhibits include a transcript of the hearing at
which Dr. Bauman was able to present evidence and witnesses to
rebut the charges against him.  Eleven witnesses, including Dr.
Bauman himself, testified.  At the conclusion of the hearing, the
committee upheld Dr. Bauman's suspension and reiterated that an
investigation of the charges should continue with "all deliberate
speed."  As part of the ongoing investigation, Dr. Bauman
underwent psychiatric evaluations.  Moreover, Dr. Brodman's
letter of July 21, 2005, states that the investigation was
completed and provides continuing and additional issues with Dr.
Bauman's practice that emerged as a result of that investigation.
The letter also details Dr. Bauman's failure to comply with the
terms and spirit of the Agreement that governed the restoration
of his privileges and led to his termination: he had not reduced
his patient load or his hours; he had performed a high number of
induced labors; and he refused to meet with the Administrators
about their concerns.  Again, those concerns were only the latest
in a series problems with Dr. Bauman's conduct dating back to
1994.

As there can be no doubt that an investigation of
patient concerns was taken in good faith, the statements
contained in the Report and made with respect to the implications
of Dr. Bauman's entering into the Agreement are undeniably true.
Accordingly, plaintiffs' claims based on the purported falsity of

these assertions fail.  <u>See</u> <u>Weber v. Multimedia Entm't, Inc.</u>, No. 97 Civ. 0682 (JGK), 2000 WL 526726, *10 (S.D.N.Y. May 2, 2000) (finding truth an absolute defense to defamation).

### 3.  **Further Allegations of Fraud**

Dr. Bauman contends that he was somehow defrauded into entering into the Agreement restricting his privileges by statements that there would be an investigation of the charges against him.  As set forth above, his claims of fraud based on an any alleged failure to conduct a full investigation related to patient concerns necessary fail.  Plaintiffs also make further allegations of fraud, and, as an additional act of racketeering to support their RICO claims, they allege that defendants engaged in Medicaid billing "for services related to births which were induced by Misoprostol."  (AC ¶¶ 126, 131).

First, violations of the federal health care statute, 18 U.S.C. § 1347, are not recognized predicate acts under RICO, 18 U.S.C. § 1961.  But more importantly, plaintiffs' allegations -- which are entirely speculative, as they are made upon information and belief, without any explanation as to the basis for that belief -- have nothing to do with plaintiffs' case.  <u>See</u> <u>Spira v. Nick</u>, 876 F. Supp. 553, 557 (S.D.N.Y. 1995).  In addition, even assuming plaintiffs engaged in improper Medicaid billing, plaintiffs have not alleged how this billing adversely affected plaintiffs or how these allegations support their claims.  An additional defect in these allegations -- true of all of plaintiffs' allegations of fraud -- is that plaintiffs fail to

meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  That is, with respect to each allegation of fraud, the Amended Complaint utterly omits "the who, what, when, where and how of the alleged fraud."  <u>U.S. ex rel. Woods v. Empire Blue Cross & Blue Shield</u>, No. 99 Civ. 4968 (DC), 2002 WL 1905899, at *4 (S.D.N.Y. Aug. 19, 2002).

Accordingly the RICO and fraud claims are dismissed on these grounds as well.

In sum, I reject Dr. Bauman's allegations of a grand conspiracy designed to ruin his reputation and take over his medical practice.  His suggestion that all the individuals involved -- Dr. Brodman, Dr. Drayer, Dr. Rubin, Dr. Figur, the physician's assistant, the third-year resident, the members of the QCC and the Hearing Committee, the administrator who authored the Report, the psychiatrist who evaluated his competence, and the physicians who covered his patients -- were somehow engaged in a malicious scheme to oust him from the Hospital is supported by nothing but sheer speculation.  To the contrary, the exhibits attached to the Amended Complaint demonstrate that the actions taken to suspend Dr. Bauman, restrict his practice, and eventually terminate his privileges were reasonably based upon serious and founded allegations that he violated Hospital protocol -- allegations the Hospital had to investigate -- and a pattern of non-compliance with the conditions of his reinstatement.

## CONCLUSION

For the foregoing reasons, the motion to dismiss is granted. The Amended Complaint is dismissed as to all defendants, with prejudice, and with costs in favor of the moving defendants. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED

Dated:    New York, New York
          September 29, 2006

DENNY CHIN
United States District Judge

- 28 -